Opinion filed April 28, 2022



In The

# Eleventh Court of Appeals

_____

## No. 11-20-00076-CV
_____

**JULIE MCLEOD, INDIVIDUALLY AND AS INDEPENDENT EXECUTOR OF THE ESTATE OF BARRY MCLEOD, Appellant**

**V.**

**WANDA MCLEOD, INDIVIDUALLY AND DERIVATIVELY ON BEHALF OF MCLEOD PROPERTY DEVELOPMENT, LLC, AND MICHEL MANFREDONIA, Appellees**

**On Appeal from the 104th District Court**
**Taylor County, Texas**
**Trial Court Cause No. 27260-B**

## O P I N I O N

This appeal arises from a six-day jury trial. The underlying suit concerned McLeod Property Development, LLC, (MPD) a family-member-owned residential property development in Abilene. In 2012, Barry McLeod approached his mother, Appellee Wanda McLeod, about the prospect of developing 112 acres that she

owned.[1] He wanted to develop a portion of her farm into a residential property development. Barry and Wanda formed MPD for the purpose of developing the property. Barry and Wanda were the only members of MPD at the time that it was formed.

Even though Wanda was listed as a managing member of MPD, she did not have any role in its management for the first four years. Barry was the controlling member of MPD until he died unexpectedly on September 23, 2016. Upon Barry's death, his wife, Appellant Julie McLeod, began operating MPD. Disputes soon arose between Wanda and Julie concerning the operation of MPD. Most of the disputes focused on the manner in which Barry had operated MPD. Wanda subsequently took control of MPD from Julie in early 2017.

Wanda filed the underlying lawsuit in January 2018 against Julie in Julie's capacity as the executor of Barry's estate. Wanda alleged causes of action against Barry's estate for breach of fiduciary duty, breach of contract, and unjust enrichment. Julie later filed a petition in intervention in both her individual capacity and derivatively on behalf of MPD against Wanda. Julie also named Wanda's daughter, Michel McLeod Manfredonia, as a third-party defendant. Wanda subsequently filed an amended petition wherein she sued Julie in her individual capacity. Wanda alleged that Julie knowingly participated in Barry's breaches of fiduciary duty.

The trial court submitted a charge to the jury that contained thirty-seven questions.[2] The jury determined that Barry owed Wanda a fiduciary duty that he breached. The jury also determined that Barry breached the fiduciary duty that he

---

[1]Because the individual parties in this action are all related, we will refer to them by their first names.

[2]Most of the issues in the trial court's charge were conditionally submitted. As a result, the jury did not answer many of the questions contained in the charge based upon their answers to predicate questions.

owed to MPD. The jury determined that Barry's breaches of fiduciary duty that he owed to Wanda and MPD were not excused and that Julie was not a knowing participant in these breaches. The jury determined that Barry was unjustly enriched and that five items of property were traceable to his acts of unjust enrichment. The jury determined Wanda did not approve Julie as a member of MPD. The jury also determined that Wanda did not comply with all of the fiduciary duties that she owed to MPD. However, the jury determined that MPD did not suffer any damages because of Wanda's breach of fiduciary duty.

Julie brings ten issues on appeal. She primarily challenges the recoveries obtained by Wanda and MPD against Barry's estate. We affirm in part and we reverse and render in part.

*Background Facts*

Wanda and her late husband, Garth McLeod, had four children: David, Sharon, Michel, and Barry. Both Garth and David died prior to the formation of MPD. Wanda and Garth owned a 441-acre farm on the edge of Abilene. Wanda testified that she and Garth bought the farm as an investment for their retirement. MPD's residential property development was located on a portion of this farm.

Prior to Garth's death, Barry approached Garth about developing a portion of the farm. Wanda testified that Garth was reluctant to develop the property because of his age. Garth eventually scheduled a meeting with a local engineering firm to discuss the development. However, Garth died before the meeting occurred. Barry then approached Wanda about developing the property. Wanda was also reluctant because of her age (74). However, Wanda eventually decided to let Barry develop the property.

At trial, Wanda and Julie disagreed on the terms of the agreement between Barry and Wanda for the purchase of Wanda's property. The jury determined that

3

Barry agreed to pay Wanda $7,000 an acre for 112 of the acres that she deeded to MPD at the inception of MPD and then Wanda would be paid an additional $4,000 per acre for each acre sold in the development. The jury also determined that Barry did not fail to comply with this agreement. Neither party challenges these jury findings.

Wanda testified that she and Barry agreed that each would also contribute $500,000 to the development, in addition to her real property, and that they would split profits 50/50. With respect to her $500,000 contribution, Barry told Wanda that she needed to obtain a loan for this money. She executed a promissory note in 2013, pledging a part of her farm as collateral.

Prior to his death, Barry managed all of the affairs of MPD. Wanda testified that Barry never paid her fifty percent of the profits from MPD. In this regard, Wanda testified that Barry told her that MPD had not made any profits. However, the financial records of MPD indicated that it had a net book income of $525,883 for 2013 through 2016.

At the time of Barry's death, $167,000 remained unpaid on Wanda's note. Wanda believed that Barry had been making payments on her note. However, he had only paid the interest on her note during the year prior to his death. Conversely, Barry contributed less money to MPD than did Wanda because he had other indebtedness that limited the money that he could contribute to the development.

After Barry's death, Wanda learned about the manner in which Barry had operated MPD. Wanda testified about numerous withdrawals and expenditures made by Barry from MPD's accounts of which she was not aware. For example, Barry used MPD funds to purchase an Audi for his daughter and a BMW for Julie. He also used MPD funds to purchase two rental houses for himself. Barry used MPD funds to pay his and Julie's personal income taxes, their ad valorem taxes, his

son's personal income taxes, and his daughter's college tuition. MPD also paid interest on loans for other properties owned by Barry.

Randy Bibb, Barry's long-time accountant, also performed accounting services for MPD at Barry's request. Bibb's knowledge about the financial affairs of MPD was based on the information provided to him by Barry. Bibb testified that he was aware that Barry was taking money from MPD in the form of draws and that Barry was taking an excessive amount as compared to the few draws that were allocated to Wanda. Bibb agreed that Barry took out "hundreds of thousands of dollars, actual cash money" from MPD in the form of draws.

Bibb testified that he had a discussion with Barry in April 2016 about his draws being excessive and increasing. This discussion occurred during the time that Bibb prepared the 2015 tax returns for MPD, Barry, and Wanda. Bibb testified that he told Barry that he needed to discuss the situation with Wanda because she "needs to know." Bibb testified that Barry later told him that he had discussed the matter with Wanda; Barry reported to Bibb that "Mother is fine."

Bibb testified that at the end of 2015, the balance of Wanda's capital account in MPD was approximately $654,000 and the balance of Barry's capital account was $103,390. Thus, Bibb indicated that Barry's account was "short" of Wanda's capital account by $550,633.62 at the beginning of 2016. By the end of 2016, Bibb noted that the difference between the capital accounts was $722,322.92 based in part because Barry's draws in 2016 were $247,174.99 while Wanda's draws were $75,485.70.

Upon Barry's death, Julie initially took over operations of MPD. Julie testified that Wanda asked her to help with MPD. In this regard, Wanda testified that she was grieving the loss of her son at the time. Julie and Wanda discovered that the balance of MPD's bank account was $19,000 on the date of Barry's death.

5

Julie also discovered that MPD had an outstanding bill at that time for street work in the amount of $190,000. Additionally, $167,000 remained owed at Barry's death on Wanda's note for the money that she borrowed to fund MPD. However, MPD had an inventory of lots available for sale. Julie testified that she was able to sell enough lots to pay the outstanding bill and increase the balance of the MPD account to $680,000.

Bibb testified that Julie took Barry's place as the source of Bibb's information about MPD. Bibb soon advised Julie that there was a problem with the capital accounts for MPD. Julie testified that Bibb told her that the capital accounts were "way off" and that they needed to be balanced. Julie wrote Bibb a letter dated February 10, 2017, wherein she stated: "It is my understanding from our prior meeting that the capital account for McLeod Property Development LLC is out of balance, largely because Barry withdrew money from the partnership account without equal distributions going to his mother." Julie asked Bibb to provide her with an accounting on behalf of MPD "which shows the total amount of money Barry's estate owes the partnership [to] make up the shortfall."

Bibb responded to Julie's request in a letter dated February 13, 2017. Among other things, Bibb proposed that Barry's estate should deposit a check for $191,161.46 into MPD's account. Bibb further proposed that MPD should make a payment of $489,091.46 to Wanda. Julie complied with Bibb's proposal by obtaining a loan for the payment of the $191,161.46 that was to be made by Barry's estate into MPD. After depositing the money into MPD's account, Julie sent two checks drawn on MPD's account totaling $489,091.46 to Wanda.

Wanda did not accept Julie's offer to settle the capital accounts in the manner proposed by Bibb. Wanda testified that she rejected the proposal because the checks were written on MPD's account "so that would've been half of mine if it was coming

out of McLeod Property." Wanda also felt that the payment proposed by Bibb and Julie did not adequately compensate her for her land.

Wanda soon replaced Julie as the person that operated MPD. Wanda testified that she asked Michel to help her with MPD to find where the money for MPD "went." Wanda, aided by Michel, operated MPD until the time of trial. Wanda continued to develop and sell lots in the property development without participation by Julie. One of the things that Wanda did after taking over MPD was to withdraw all of the money out of MPD's account. She testified that she pulled the money out on the advice of counsel and put it in accounts in other banks. Wanda withdrew over $700,000 from the MPD account in 2017. However, she testified that she later put the money back into the MPD account, less $167,000 that she used to pay off her indebtedness for MPD. Wanda also paid Michel approximately $140,000 for doing work for MPD.

Bibb testified as a witness on damages for Julie. In his analysis, he classified all of the money taken out of MPD by Wanda after she took over MPD as draws taken by her. He opined that Wanda "got paid for her land" when she took the money out of MPD. Bibb also opined that the legal fees paid by Wanda and the money she paid to Michel should be considered to be draws taken by Wanda rather than expenses of MPD. As of the time of trial, Bibb opined that Wanda's capital account balance was $517,167, and that the capital account balance for Barry's estate was $361,703.

Wanda hired Louis Flores as the accountant for MPD after she took control of MPD. Flores disagreed with the manner in which Bibb accounted for the land contributed to MPD. He opined that the land contributed by Wanda should have been credited one hundred percent to her capital account rather than being split 50/50 between Barry's and Wanda's capital account. Flores testified that at the time of

7

trial, the balance of Wanda's capital account was $455,500.32 and that the balance of Barry's capital account was $116,000.

During closing arguments, Wanda's attorney sought damages of $1,370,255.24 on her behalf for Barry's breach of fiduciary duty. This figure was calculated based upon an estimate of fifty percent of the profits of MPD during Barry's lifetime ($322,255.24) and Wanda's calculation of the amount owed to her for her land ($1,048,000). For MPD, Wanda's attorney sought damages of $597,782.15 from Barry's estate based upon a calculation of the money that Barry spent from MPD's account for personal expenditures. Conversely, Julie's attorney sought damages of $318,610 on behalf of MPD to be paid by Wanda and Michel.

The jury awarded Wanda $150,000 for Barry's breach of fiduciary duty, and it awarded MPD $36,000 for Barry's breach of fiduciary duty. The jury also found that Barry was unjustly enriched by $109,000. The trial court entered a final judgment based upon these damage findings.[3]

*Analysis*

*Wanda's Individual Claim for Breach of Fiduciary Duty*

Julie's first two issues concern Wanda's individual recovery for breach of fiduciary duty. In her first issue, Julie asserts that the trial court erred by overruling her objection to the inclusion of questions on Wanda's individual claim for breach of fiduciary duty. Julie objected to the questions based upon her assertion that Wanda did not sufficiently plead an individual cause of action for breach of fiduciary duty as contemplated by the proposed charge of the court.

---

[3]The jury also found that Michel was unjustly enriched by payments from MPD in the amount of $40,000. In the trial court's amended final judgment, the trial court determined that this jury finding was immaterial because Julie lacked standing to sue Michel on behalf of MPD. Accordingly, the amended final judgment did not include damages assessed against Michel. Julie does not challenge this ruling on appeal.

The first question in the trial court's charge asked if a relationship of trust and confidence existed between Barry and Wanda. *See* Comm. on Pattern Jury Charges, State Bar of Texas, *Texas Pattern Jury Charges: Business, Consumer, Insurance & Employment* PJC 104.1 (2018) (Question and Instruction—Existence of Relationship of Trust and Confidence). Julie asserted that Wanda did not plead a special relationship that would support the submission of this question. The trial court overruled Julie's objection to the submission of the first question.

We review the trial court's submission of its charge to the jury for abuse of discretion. *Brumley v. McDuff*, 616 S.W.3d 826, 831 (Tex. 2021) (citing *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990)). A trial court must submit jury questions, instructions, and definitions "raised by the written pleadings and the evidence." *Id.* (quoting TEX. R. CIV. P. 278).

"Under the fair-notice standard governing pleadings, a party's filing need only provide enough 'notice of the facts upon which the pleader bases his claim' such that 'the opposing party [has] information sufficient to enable him to prepare a defense.'" *Li v. Pemberton Park Cmty. Ass'n*, 631 S.W.3d 701, 705 (Tex. 2021) (quoting *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982)). "A plaintiff sufficiently pleads a cause of action when the elements of the claim and the relief sought may be discerned from the pleadings alone." *Brumley*, 616 S.W.3d at 831 (citing *Stoner v. Thompson*, 578 S.W.2d 679, 683 (Tex. 1979)). "Mere formalities, minor defects and technical insufficiencies will not invalidate a . . . judgment where the petition states a cause of action and gives 'fair notice' to the opposing party of the relief sought." *Id.* (alteration in original) (quoting *Stoner*, 578 S.W.2d at 683). "The key inquiry is whether the opposing party 'can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant.'" *Kinder Morgan*

9

*SACROC, LP v. Scurry Cty.*, 622 S.W.3d 835, 849 (Tex. 2021) (quoting *DeRoeck v. DHM Ventures, LLC*, 556 S.W.3d 831, 835 (Tex. 2018)).

"The proper response to a legally or factually infirm pleading is to file special exceptions objecting to the pleading." *Brumley*, 616 S.W.3d at 831 (citing TEX. R. CIV. P. 91). Special exceptions notify the parties and the trial court that legal or factual uncertainty exists as to the claimed cause of action. *Id.*

Wanda began the pleading of her causes of action for breach of fiduciary duty by incorporating her prior factual allegations. Her factual allegations included that Barry was her son, that her participation in MPD was "[u]pon Barry's instruction," that Barry was the managing and controlling member of MPD that handled all of the financials for the company, and that he withdrew funds from MPD without her knowledge or approval. Wanda then pleaded as follows:

> As the controlling member of MPD, Barry owed a fiduciary duty to the company and its members. Barry breached that duty, by wrongfully suppressing and withholding funds to Wanda in order to use the corporate profits for his own personal gain. Barry wrongfully used the company account as his own personal piggy-bank without notifying or seeking Wanda's consent. Barry misappropriated company funds for his own personal use and to pay off his loans in full while not paying Wanda's loan in full. Barry's self-dealing is a breach of his fiduciary duties.

Wanda additionally asserted that both she and MPD suffered damages as a result of Barry's breach of fiduciary duty. She sought actual damages as well as disgorgement of "all consideration, revenues, profits, or other monies wrongfully obtained from MPD or Wanda."

Julie filed a special exception to Wanda's claims for breach of fiduciary duty. Julie asserted that Wanda alleged "a very general and generic claim for breach of fiduciary duty" and that Wanda failed "to articulate what fiduciary duty [Barry] owed to" Wanda. However, the record does not indicate that the trial court held a

10

hearing on Julie's special exceptions, and it does not contain an order ruling on her special exceptions.

"Every defect, omission or fault in a pleading[,] either of form or of substance," is waived unless it is specially pointed out by a special exception "in writing and brought to the attention" of the trial court before the complained-of judgment or order is signed. TEX. R. CIV. P. 90; *see Peek v. Equip. Serv. Co. of San Antonio*, 779 S.W.2d 802, 805 (Tex. 1989); *Smith v. Grace*, 919 S.W.2d 673, 678 (Tex. App.—Dallas 1996, writ denied). When special exceptions are filed, the movant has the burden of obtaining a hearing on its special exceptions and a written ruling. *Hartwell v. Lone Star, PCA*, 528 S.W.3d 750, 765 (Tex. App.—Texarkana 2017, pet. dism'd); *Smith*, 919 S.W.2d at 678. The failure to do so results in waiver related to pleading defects and omissions. *Hartwell*, 528 S.W.3d at 765.

In the absence of special exceptions or other motion challenging the sufficiency of the pleadings, we construe a petition liberally in favor of the pleader. *Brumley*, 616 S.W.3d at 831 (citing *Roark*, 633 S.W.2d at 809). "Every fact will be supplied that can reasonably be inferred from what is specifically stated." *Roark*, 633 S.W.2d at 809–10 (quoting *Gulf, Colo. & Santa Fe Ry. Co. v. Bliss*, 368 S.W.2d 594, 599 (Tex. 1963)).

To succeed on a claim for breach of fiduciary duty, a plaintiff must establish (1) a fiduciary relationship between the plaintiff and defendant, (2) a breach by the defendant of his fiduciary duty to the plaintiff, and (3) an injury to the plaintiff or benefit to the defendant as a result of the defendant's breach. *Dipprey v. Double Diamond, Inc.*, 637 S.W.3d 784, 802 (Tex. App.—Eastland 2021, no pet.). "Certain formal relationships create fiduciary relationships as a matter of law." *Id.* (quoting *Severs v. Mira Vista Homeowners Ass'n, Inc.*, 559 S.W.3d 684, 703 (Tex. App.—Fort Worth 2018, pet. denied)); *see Crim Truck & Tractor v. Navistar Int'l Transp.*

11

*Corp.*, 823 S.W.2d 591, 594 (Tex. 1992), *superseded by statute on other grounds as noted in Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225–26 (Tex. 2002). Julie contends that Wanda only pleaded an individual cause of action for breach of fiduciary duty based on a formal relationship by virtue of Barry's position as the controlling member of MPD. However, Texas courts have not recognized that a broad formal fiduciary duty exists between members of an LLC. *See Siddiqui v. Fancy Bites, LLC*, 504 S.W.3d 349, 366 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *Allen v. Devon Energy Holdings, L.L.C.*, 367 S.W.3d 355, 391 (Tex. App.—Houston [1st Dist.] 2012, pet. granted, judgm't vacated w.r.m.).

Sometimes informal relationships, whether moral, social, domestic, or purely personal, may also give rise to fiduciary duties where one person trusts in and relies on another. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176 (Tex. 1997); *Dipprey*, 637 S.W.3d at 802; *Severs*, 559 S.W.3d at 703. "But not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship." *Swanson*, 959 S.W.2d at 176–77. In order to give full force to contracts, courts do not create fiduciary relationships lightly. *Id.* at 177. Thus, "to impose such a relationship in a business transaction, the relationship must exist prior to, and apart from, the agreement made the basis of the suit." *Id.* "[M]ere subjective trust does not . . . transform arm's-length dealing into a fiduciary relationship." *Id.*

Wanda pleaded an individual cause of action for breach of fiduciary duty, and she pleaded the relief that she sought for it. The question to be resolved is whether she adequately pleaded the basis for fiduciary duty that was submitted to the jury—a special relationship of trust and confidence existing between her and her son. More specifically, the issue we must determine is whether the trial court abused its discretion by determining that Wanda pleaded a special relationship between her and

her son that would support the imposition of an informal fiduciary duty on Barry in his dealings with his mother.

Here, the trial court did not abuse its discretion by determining that Wanda's pleadings constituted fair notice that she was relying on a special relationship of trust and confidence that existed prior to, and apart from, the formation of MPD with Barry. Wanda's pleading provided sufficient notice of the facts upon which she based her individual claim for breach of fiduciary duty to enable Julie to prepare a defense to that claim. *See Li*, 631 S.W.3d at 705. To the extent there was a defect in Wanda's pleading of this cause of action, Julie waived that complaint by failing to obtain a ruling on her special exception. Accordingly, we overrule Julie's first issue.

In her second issue, Julie challenges the legal sufficiency of the evidence supporting the jury's damage award of $150,000 to Wanda for Barry's breach of fiduciary duty. Julie contends that the jury "appeared to pluck the $150,000 sum out of thin air." Julie asserts that there was no evidence offered at trial of any quantifiable economic damage sustained by Wanda. She premises this contention on Wanda's act of withdrawing a large sum of money out of MPD's account after Wanda took over operation of MPD. Julie asserts that this act had the effect of remedying any financial improprieties committed by Barry.

When the appellant challenges the legal sufficiency of the evidence supporting an adverse finding on which she did not have the burden of proof at trial, she must demonstrate that there is no evidence to support the adverse finding. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). Under a legal sufficiency review, we consider all of the evidence in the light most favorable to the prevailing party, make every reasonable inference in that party's favor, and disregard contrary evidence unless a

13

reasonable factfinder could not. *City of Keller*, 168 S.W.3d at 807, 822, 827. We cannot substitute our judgment for that of the factfinder if the evidence falls within this zone of reasonable disagreement. *Id.* at 822.

The evidence is legally insufficient to support a finding only if (1) the record discloses a complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the only evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810. "Anything more than a scintilla of evidence is legally sufficient to support the finding." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). "More than a scintilla of evidence exists when the evidence would enable reasonable and fair-minded people to reach different conclusions." *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014). "However, if the evidence is so weak that it only creates a mere surmise or suspicion of its existence, it is regarded as no evidence." *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex. 2014).

Julie's tenth issue consists of a catch-all issue wherein she seeks a new trial if we do not render a judgment in her favor. Included within her tenth issue is a challenge to the factual sufficiency of the evidence supporting all jury findings to which she challenged the legal sufficiency. In a single sentence, she asserts that "[t]here was factually insufficient evidence supporting the jury's damages award[] against the Estate for Barry's fiduciary obligations to Wanda."

If a party attacks the factual sufficiency of an adverse finding on an issue in which the other party had the burden of proof, the attacking party must demonstrate that there is insufficient evidence to support the adverse finding. *Croucher*, 660 S.W.2d at 58. In a factual-sufficiency challenge, we consider and weigh all of the

14

evidence, both supporting and contradicting the finding. *See Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). We may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* at 407. We may not substitute our own judgment for that of the factfinder or pass upon the credibility of witnesses. *Id.*

Breach of fiduciary duty is an independent tort that will support an award of actual damages.[4] *Manges v. Guerra*, 673 S.W.2d 180, 184 (Tex. 1984). A fiduciary is liable for any loss or damages suffered by the plaintiff. *Slay v. Burnett Trust*, 187 S.W.2d 377, 391 (Tex. 1945). Here, the damage question in the trial court's charge did not include any specific damage elements for the jury to consider. In the absence of any specific damage elements in the damage question, it is difficult to determine what matters the jury considered in determining Wanda's damages for Barry's breach of fiduciary duty.[5] As noted above, Wanda's attorney identified two damage elements in closing arguments for which Wanda sought an individual recovery for Barry's breach of fiduciary duty: fifty percent of the adjusted net book income[6] of MPD during Barry's lifetime ($322,255.24) and Wanda's calculation of the amount owed to her for her land ($1,048,000).

---

[4]In addition to actual damages, there are also numerous equitable remedies available for a breach of fiduciary duty. *See* Comm. on Pattern Jury Charges, State Bar of Texas, *Texas Pattern Jury Charges: Business, Consumer, Insurance & Employment* PJC 115.15 (2018) (Remedies for Breach of Fiduciary Duty (Comment)). These equitable remedies are available without a claimant having to establish that he or she suffered actual damages. *See id.* (citing *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017); *Burrow v. Arce*, 997 S.W.2d 229, 238, 240 (Tex. 1999)).

[5]The comments to the Pattern Jury Charges for the question for actual damages for breach of fiduciary duty recommends that multiple elements of damages be separately submitted to the jury. *See* Comm. on Pattern Jury Charges, State Bar of Texas, *Texas Pattern Jury Charges: Business, Consumer, Insurance & Employment* PJC 115.18 (2018) (Question on Actual Damages for Breach of Fiduciary Duty).

[6]Wanda's attorney took fifty percent of Bibb's calculation of net book income for MPD from its inception through the end of 2016, and then the attorney made adjustments based on matters he learned about Barry's actions after Bibb performed his calculation.

Julie cites *First State Bank v. Keilman* for the proposition for that a jury may not "pull figures out of a hat" when assessing damages. 851 S.W.2d 914, 930 (Tex. App.—Austin 1993, writ denied) (quoting *Neiman–Marcus Group, Inc. v. Dworkin*, 919 F.2d 368, 372 (5th Cir.1990)). *Keilman* involved a claim for unauthorized interest. *Id.* at 930–31. There, the evidence presented at trial showed that the amount of unauthorized interest was either zero or $7,161.44. *Id.* However, the jury awarded damages of $360. *Id.* The Austin Court of Appeals found that the evidence supporting the jury's award was factually insufficient because there was no rational basis for its calculation in light of the evidence presented at trial. *Id.*

The holding in *Keilman* is inapplicable to the facts in this case. As later explained in *Pleasant v. Bradford*, *Keilman* involved a situation where the jury was presented with only two possible damage amounts. 260 S.W.3d 546, 560 (Tex. App.—Austin 2008, pet. denied); *see Holland v. Lovelace*, 352 S.W.3d 777, 792–95 (Tex. App.—Dallas 2011, pet. denied). But when the evidence presented to the jury involves a range of damage options, *Keilman*'s outcome is not necessarily applicable provided that the jury's award is supported by the evidence and a reasonable basis exists for its calculation. *Pleasant*, 260 S.W.3d at 559–61; *see Holland*, 352 S.W.3d at 792–95.

The evidence in this case detailed three phases of MPD's operation: the initial phase when Barry controlled it; the second phase when Julie operated it; and the third phase when Wanda operated it. Wanda placed greater emphasis on the initial phase by focusing primarily on Barry's actions. During this initial phase, there is no dispute that Barry took draws from MPD of at least $500,000, many of which were for personal purposes. MPD had net book income of over $500,000 during this period, yet Wanda did not receive any profits during this period despite her agreement with Barry to split profits 50/50. However, fifty percent of the profits

16

were allocated to Wanda for tax purposes even though she was not actually receiving profits from MPD. These unrealized profits had the effect of decreasing the amount that Wanda received in social security benefits.

Conversely, Julie placed greater emphasis on the third phase by asserting that the manner in which Wanda operated MPD remedied all of Barry's financial irregularities. As noted by Julie, her damage calculations depended on the accounting principle of capital accounts with respect to a limited liability company.

The parties called two accountants as witnesses, and the parties offered thousands of pages of banking records and other financial documents. In many respects, the evidence in this case is similar to the circumstances in *Holland* because it involved competing experts that testified about financial records. *See* 352 S.W.3d at 792–95. As noted by the court in *Holland*, the jury is free to accept or reject all or any portion of the testimony of an expert. *Id.* at 794 (citing *Kirkpatrick v. Mem'l Hosp. of Garland*, 862 S.W.2d 762, 772 (Tex. App.—Dallas 1993, writ denied), for the proposition that "[i]t is particularly within the jury's province to weigh opinion evidence and the judgment of experts").

"As a general rule, the jury has broad discretion to award damages within the range of evidence presented at trial, as long as a rational basis exists for its calculation." *Id.* at 792 (citing *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 760 (Tex. App.—Dallas 2008, no pet.)). The jury's findings will not be disregarded merely because its reasoning in arriving at its figures may be unclear. *Id.* The fact that there is nothing in the record to show how the jury arrived at a specific amount is not necessarily fatal to the verdict. *Id.* Instead, when the evidence supports a range of awards, as opposed to two distinct options, an award of damages within that range may be an appropriate exercise of the jury's discretion. *Id.*

As presented to the jury, the evidence in this case required the jury to strike a balance from an accounting perspective between Wanda and Barry's estate. While the jury's award of $150,000 to Wanda for Barry's breach of fiduciary duty does not correlate to a specific damage element of that same amount, it falls within the range of damages detailed in the testimony of the parties and the accountants. We disagree with Julie's contention that the jury was essentially required to accept her position that Wanda later remedied her damages caused by Barry's breach of fiduciary duty. Because there is some evidence supporting the jury's damage finding, we overrule Julie's second issue challenging the legal sufficiency of the evidence supporting the jury's damage finding. The jury's damage finding is also supported by factually sufficient evidence because it is not against the great weight and preponderance of the evidence.

*MPD's Claim for Breach of Fiduciary Duty*

Julie asserts in her third issue that there is legally insufficient evidence to support the jury's damage award of $36,000 to MPD for Barry's breach of fiduciary duty. In her tenth issue, she also challenges the factual sufficiency of the evidence supporting this damage finding. We note that in closing argument, Wanda's attorney sought damages of $597,782.15 on behalf of MPD for Barry's breach of fiduciary duty.

Unlike with the damage finding that we addressed above, there was a damage element that corresponds to the jury's damage finding of $36,000 for MPD's claim for breach of fiduciary duty. Wanda testified that Barry had an agreement with Taylor Electric wherein it would pay MPD a $500 rebate for each home in the subdivision that obtained electric service from Taylor Electric. The evidence at trial indicated that Barry did not deposit $36,000 of these rebates into MPD's account. Because of the connection between the $36,000 damage finding and a specific item

of evidence, the jury's answer was supported by some evidence.  We overrule Julie's third issue.  Additionally, for the same reasons noted above, Wanda's actions after taking over MPD did not cause the jury's damage finding to be against the great weight and preponderance of the evidence.

*Unjust Enrichment and Constructive Trust*

The trial court's charge included three questions dealing with unjust enrichment and the imposition of a constructive trust.  Question No. 26 asked: "Was Barry unjustly enriched through his dealings with Wanda or MPD?"  Question No. 27 asked: "In what amount was Barry unjustly enriched through his dealings with Wanda or MPD?"  Question No. 28 asked: "Is the following property traceable to assets, including funds, wrongfully taken from MPD or Wanda?"  In her tenth issue, Julie contends that these issues were "fatally flawed" because they included Wanda along with MPD.  Julie asserts that the inclusion of Wanda in these questions resulted in an invalid theory of liability being submitted to the jury because there was no evidence that Barry took any funds from Wanda.

The reporter's record from the charge conference reflects that the trial court suggested that these questions needed to include "Wanda or MPD."  Julie did not object to this suggestion.  To the contrary, her attorney agreed that, at least for Question No. 26, it needed to include "Wanda or MPD."  Julie is now asserting that the trial court erred by including "Wanda or MPD" in these questions.

Under Rule 274 of the Texas Rules of Civil Procedure, "[a]ny complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections."  TEX. R. CIV. P. 274; *see Burbage*, 447 S.W.3d at 256.  An allegation that there is a lack of evidence to support the submission of a jury question must be raised by a specific objection to the trial court.  *Burbage*, 447 S.W.3d at 256 (citing *Thota v. Young*, 366

S.W.3d 678, 691 (Tex. 2012), for the proposition that "some objection to the charge" is required—whether to evidentiary support or to form—to preserve error for appellate review). Julie did not preserve error, if any, as to the inclusion of Wanda in these questions because she did not object to the questions on this basis. Accordingly, we overrule Julie's contention that these questions were defective. Additionally, we review the sufficiency of the evidence based on the question as given because the complaining party did not object to the wording of the trial court's charge. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000); *see also Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 407 (Tex. 2016); *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 254 (Tex. 2008).

Julie's fourth and fifth issues concern the jury's determination that Wanda or MPD was entitled to a recovery for unjust enrichment. In her fourth issue, Julie challenges the legal sufficiency of the evidence to support the jury's calculation for unjust enrichment. The jury found that Barry was unjustly enriched in the amount of $109,000 through his dealings with Wanda or MPD. We note that Wanda's attorney sought a finding of $597,732.15 for unjust enrichment. Julie asserts that there is no evidence of unjust enrichment because the jury determined that Barry did not breach his agreement with Wanda for the operation of MPD.

Julie's fifth issue is related to her evidentiary challenge because she contends that the claim for unjust enrichment was precluded because it was covered under a contract. The contract upon which Julie relies for her fourth and fifth issues is the written agreement between Wanda and Barry dated March 2, 2015. Julie contends that, because the jury determined that Barry complied with the 2015 written agreement, the jury's unjust enrichment finding was improper.

The doctrine of unjust enrichment is appropriate "when one person has obtained a benefit from another by fraud, duress, or the taking of an undue

20

advantage." *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 921 (Tex. 2010) (quoting *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)). Unjust enrichment is an implied-contract theory providing that one should make restitution when it would be unjust to retain benefits received. *Protocol Techs., Inc. v. J.B. Grand Canyon Dairy, L.P.*, 406 S.W.3d 609, 614 (Tex. App.— Eastland 2013, no pet.) (citing *Walker v. Cotter Props., Inc.*, 181 S.W.3d 895, 900 (Tex. App.—Dallas 2006, no pet.)).

Because unjust enrichment is quasi-contractual, it may not be submitted to the jury "when a valid, express contract covers the subject matter of the parties' dispute." *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) (citing *TransAmerican Nat. Gas Corp. v. Finkelstein*, 933 S.W.2d 591, 600 (Tex. App.— San Antonio 1996, writ denied)) (no recovery for unjust enrichment if the same subject is covered by an express contract). Unjust enrichment applies the principles of restitution to disputes that are not governed by a contract between the parties. *Burlington N. R.R. Co. v. Sw. Elec. Power Co.*, 925 S.W.2d 92, 97 (Tex. App.— Texarkana 1996), *aff'd sub nom. Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467 (Tex. 1998). Restitution "focuses on forcing the defendant to disgorge benefits that it would be unjust to keep, rather than on compensating the plaintiff. The principle that underlies the remedy of restitution is the avoidance of unjust enrichment." *City of Harker Heights, Tex. v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313, 317 (Tex. App.—Austin 1992, no writ).

Julie's reliance on the 2015 written agreement, as well as the jury's determination that Barry did not breach it, is misplaced. We first note that Julie did not timely object to the jury verdict on the basis that the jury's findings were conflicting. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 518 (Tex. 2018) ("[T]o preserve error based on fatally conflicting jury answers, parties must

raise that objection before the trial court discharges the jury."); *see also Roling v. Alamo Grp. (USA), Inc.*, 840 S.W.2d 107, 109–10 (Tex. App.—Eastland 1992, writ denied).

The 2015 written agreement was not the only agreement between Wanda and Barry regarding the operation of MPD. Barry and Wanda formed MPD in March 2012. The 2015 written agreement did not come about until three years later. The jury determined that Wanda and Barry had a prior verbal agreement pertaining to the formation of MPD that included what Wanda was to be paid for her 112 acres of land.

The 2015 written agreement provided as follows:

McLeod Property Development LLC

McLeod Property Development was formed as an equal partnership between Wanda McLeod and Barry McLeod with the purpose of developing a hundred and twelve acre tract of land located in Taylor County Texas into residential lots. All net profits will be split 50/50 between the two partners. When McLeod Property pays off the initial debt that was used for infrastructure Barry McLeod will begin to pay Wanda McLeod 4,000.00 for each acre sold. In the event one partner becomes incapacitated or deceased the partnership will continue to develop residential lots on the original tract of land until it is fully developed. The Original partner will become the Agent for McLeod Property, unless both parties decide otherwise, and the net profits will be split 50/50 between the original partner and the estate of the other partner. When the hundred twelve acre tract of land is fully developed the original partner and the estate of the other will decide whether or not to continue developing or dissolve the partnership. This document will be executed in duplicate each one being deemed an original. This is the entire agreement between both parties.

The 2015 written agreement makes no reference to the treatment of items of property purchased with MPD funds. In this regard, Wanda asserted that Barry used MPD funds to purchase five items of property. The jury determined that the five items

22

were traceable to assets, including funds, wrongfully taken by Barry. Because the 2015 written agreement does not unambiguously cover the parties' dispute pertaining to these items of property, the claims against Barry's estate for unjust enrichment are not barred as a matter of law. *See Fortune Prod.*, 52 S.W.3d at 683; *GRCDallasHomes LLC v. Caldwell*, 619 S.W.3d 301, 308 (Tex. App.—Fort Worth 2021, pet. denied). Therefore, it was incumbent on Julie to secure jury findings that an express contract existed that covered the subject matter of the dispute. *See Fortune Prod.*, 52 S.W.3d at 685; *Caldwell*, 619 S.W.3d at 308–09. Thus, Julie waived her express-contract defense to Wanda's claim for unjust enrichment. *Caldwell*, 619 S.W.3d at 308–09. We overrule Julie's fifth issue.

We also conclude that the jury's affirmative finding of unjust enrichment is supported by legally and factually sufficient evidence. With respect to the jury's finding of no damages for the breach of the 2015 written agreement, it does not conflict with the jury's finding that unjust enrichment occurred because the agreement did not address items of property purchased with MPD funds. *See Menchaca*, 545 S.W.3d at 508 (jury findings only conflict if they are about the same material fact). "If the court can reasonably construe the findings in a way that harmonizes them, it must do so 'when possible.'" *Id.* at 509 (quoting *Bender v. S. Pac. Transp. Co.*, 600 S.W.2d 257, 260 (Tex. 1980)). Furthermore, Wanda's actions after taking over MPD did not render the jury's finding of unjust enrichment to be against the great weight and preponderance of the evidence. We overrule Julie's fourth issue.

Julie's sixth, seventh, and eighth issues concern the constructive trust imposed by the trial court. The jury determined that five items of property were traceable to funds wrongfully taken by Barry from "MPD or Wanda." In her sixth issue, she asserts that there is no evidence that supports the imposition of a constructive trust.

In her seventh issue, she asserts that a constructive trust was improper as a matter of law. Julie contends in her eighth issue that the constructive trust imposed by the trial court was an impermissible double recovery.

"A constructive trust is an equitable, court-created remedy designed to prevent unjust enrichment." *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 87 (Tex. 2015). A constructive trust serves "the very broad function of redressing wrong or unjust enrichment in keeping with basic principles of equity and justice." *Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex. 1974). Generally, the imposition of a constructive trust requires that a party establish: (1) a breach of a special trust or fiduciary relationship or fraud; (2) unjust enrichment of the wrongdoer; and (3) an identifiable res that can be traced back to the original property. *KCM Fin.*, 457 S.W.3d at 87. A constructive trust may be imposed on the wrongfully taken property or the proceeds or revenues generated from the property. *Id.* at 88; *Clayton Mountain Dev., LLC v. Ruff*, No. 11-20-00101-CV, 2021 WL 3414953, at *12 (Tex. App.—Eastland Aug. 5, 2021, no pet.) (mem. op.).

The imposition of a constructive trust constitutes an equitable remedy. *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 736 (Tex. App.—San Antonio 2007, pet. denied). The jury does not determine the expediency, necessity, or propriety of equitable relief such as the imposition of a constructive trust. *Longview Energy Co. v. Huff Energy Fund LP*, 533 S.W.3d 866, 874 (Tex. 2017) (citing *Burrow v. Arce*, 997 S.W.2d 229, 245 (Tex. 1999)). "Whether 'a constructive trust should be imposed must be determined by a court based on the equity of the circumstances.'" *Id.* (quoting *Burrow*, 997 S.W.2d at 245).

Julie's sixth issue addresses the "identifiable res" element with respect to the five items of property that the jury found to be traceable to funds wrongfully taken by Barry. "To prove an identifiable res, the proponent of the constructive trust must

24

show that the specific property that is subject to the constructive trust is the same property—or the proceeds from the sale thereof or revenues therefrom—that was somehow wrongfully taken." *In re Hayward*, 480 S.W.3d 48, 52 (Tex. App.—Fort Worth 2015, orig. proceeding). A constructive trust is imposed on property so that the owner may be held to account as trustee and so that the property may be conveyed to another in equity. *Cailloux*, 224 S.W.3d at 736. "When property subject to a constructive trust is transferred, a constructive trust fastens on the proceeds." *Meadows*, 516 S.W.2d at 133. But when the property sought to be recovered or its proceeds have been dissipated so that it no longer remains, the constructive-trust-seeking proponent's only claim is that of a general creditor. *Hayward*, 480 S.W.3d at 52 (citing *Great–W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002)).

The jury heard evidence that Barry used MPD funds, either directly or indirectly, to pay all or a portion of the purchase price for the five items of property—three houses and two automobiles. Julie's evidentiary complaint is not directed to the fact that MPD's funds served as the source of funds used to purchase the properties or that they were owned by Barry at one time. Instead, Julie challenges the evidence to establish that Barry's estate continued to own the property items or the proceeds from them.

"A constructive trust is a relationship with respect to property, subjecting the person by whom the title to the property is held to an equitable duty to convey it to another, on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property." *Talley v. Howsley*, 176 S.W.2d 158, 160 (Tex. 1943); *see KCM Fin.*, 457 S.W.3d at 88; *Omohundro v. Matthews*, 341 S.W.2d 401, 405 (Tex. 1960); *Cailloux*, 224 S.W.3d at 736. But if the defendant does not hold legal title to the property upon

which the constructive trust is sought to be imposed, a constructive trust is not an appropriate remedy. *Cailloux*, 224 S.W.3d at 736.

The evidence concerning ownership of the five items of property as of the time of trial was scant. For the BMW automobile, Julie testified that she drove a BMW in the past but that she was not driving it at the time of trial. There was no other reference to the disposition of the BMW. For the Audi, Julie testified that her daughter drove it in the past but that she no longer drove it.[7] However, there was no evidence about the disposition of the Audi. Julie testified that *she*, as opposed to Barry's estate, still had the house at 1910 Ballinger and that she continued to receive rent for it, but that the rent house at 1526 Ballinger had been sold. Finally, Julie testified that her daughter lives in the house on Newcastle Drive. However, there was no further mention of the house on Newcastle.

In many respects, the parties dispute which of them had the burden of proof to establish ownership as of the time of trial. Julie contends that Wanda had the burden to establish continued ownership by Barry's estate as of the time of trial by virtue of the fact that Wanda had the burden to show an identifiable res. *See KCM Fin.*, 457 S.W.3d at 87. Conversely, Wanda asserts that Barry's estate had the burden to establish that it no longer had an interest in the property items. Wanda cites *Wilz v. Flournoy* for the proposition that, while the party seeking to impose a constructive trust has the initial burden of tracing wrongfully taken funds to the specific property sought to be recovered, the burden shifts to the defendant to establish that a portion of the property was acquired with the defendant's own funds. 228 S.W.3d 674, 676 (Tex. 2007).

---

[7]Based on what Barry told Bibb at the time of the Audi's acquisition, Bibb believed that the Audi was a company vehicle that he carried on MPD's books.

We conclude that Wanda had the burden to establish that Barry's estate continued to possess legal title in the five items of property. A party seeking to impose a constructive trust must meet the tracing requirement "with reasonable strictness." *KCM Fin.*, 457 S.W.3d at 88 (quoting *Peirce v. Sheldon Petroleum Co.*, 589 S.W.2d 849, 853 (Tex. Civ.App.—Amarillo 1979, no writ)); *see Hayward*, 480 S.W.3d at 52 (The proponent of a constructive trust must strictly prove the required elements, including the requirement to prove an identifiable res. (citing *Hubbard v. Shankle*, 138 S.W.3d 474, 485 (Tex. App.—Fort Worth 2004, pet. denied))). Wanda traced MPD funds to the purchase of the five items of property. However, she did not establish that Barry's estate continued to own the property at the time of trial.[8]

The shifting of the burden to the defendant as recognized in *Wilz* is distinguishable because it applies to a situation where the defendant asserts that a portion of the consideration for the purchase of property came from independent sources. *See* 228 S.W.3d at 676. *Wilz* applies to instances of commingling. *Id.* The question of divided ownership as a result of commingling is a matter within the province of the defendant to establish because he possesses the information upon which his claim is based. But it is particularly inapplicable to the five items of property at issue in this case—three pieces of real property and two vehicles— because the plaintiff can establish ownership of each of them by searching title records that are public documents.

The imposition of a constructive trust is a matter to be determined by the trial court. *Longview Energy Co.*, 533 S.W.3d at 874. In her sixth issue, Julie is

---

[8]We are mindful that the Estates Code provides that if a person dies leaving a lawful will, all of the person's estate that is devised by the will vests immediately in the devisees, subject to the debts of the decedent except as exempted by the law. TEX. EST. CODE ANN. §§ 101.001(a)(1), 101.051 (West 2020). A constructive trust does not arise when property is wrongful acquired. *McCabe v. Cambiano*, 212 S.W.2d 237, 240 (Tex. App.—Galveston 1948, no writ). Instead, it is a remedial procedure that can arise after the beneficiary seeks its imposition. Caryl A. Yzenbaard, George Gleason Bogert & George Taylor Bogert, BOGERT'S THE LAW OF TRUSTS AND TRUSTEES § 472 *Theory of Creation* n.3 (2021) (citing *McCabe*).

essentially asserting that the trial court did not have sufficient evidence to impose a constructive trust on the five items of property in the absence of evidence that Barry's estate continued to own them at the time of trial. We agree. "A trial court abuses its discretion by ruling (1) arbitrarily, unreasonably, or without regard to guiding legal principles; or (2) without supporting evidence." *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012) (citing *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998)).

The remedy of a constructive trust is based on the principle that the defendant will be unjustly enriched if he or she is permitted to retain the property. *KCM Fin.*, 457 S.W.3d at 88 (citing *Cailloux*, 224 S.W.3d at 736). "A constructive trust is not merely a vehicle for collecting assets as a form of damages." *Id.* In the absence of evidence that Barry's estate continued to own the items of property upon which Wanda sought a constructive trust, the remedy was not available. *See Cailloux*, 224 S.W.3d at 736. Additionally, the trial court's final judgment also placed a constructive trust on the proceeds from the five items of property. However, there was no evidence that identified any proceeds from the disposition of these property items. Accordingly, a constructive trust on unidentified proceeds was improper. *See Hayward*, 480 S.W.3d at 54–55 (citing *Great–W. Life & Annuity Ins. Co.*, 534 U.S. at 214). We sustain Julie's sixth issue. We reverse the trial court's final judgment insofar as it imposed a constructive trust, and we render judgment removing the constructive trust from the trial court's judgment.

Julie asserts in her seventh issue that the imposition of a constructive trust was improper as a matter of law because of the jury's determination that Wanda breached her fiduciary duty to MPD and because it was imposed on the entirety of the assets. Because of our disposition of Julie's sixth issue, we do not reach her seventh issue. *See* TEX. R. APP. P. 47.1. For the same reason, we do not reach Julie's eighth issue

28

complaining that the imposition of the constructive trust was an impermissible double recovery. *See id.*

*Double Recovery/Election of Remedies*

In her ninth issue, Julie contends that MPD's recovery of $36,000 for Barry's breach of fiduciary duty and Wanda's and MPD's recovery of $109,000 for unjust enrichment are an impermissible double recovery. Julie asserts that Wanda should be required to elect which of these remedies she wishes to receive. A party is not entitled to a double recovery. *Waite Hill Servs. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998) (per curiam). A double recovery exists when a plaintiff obtains more than one recovery for the same injury. *See id.* (citing *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991)). "Appellate courts have applied the one satisfaction rule when the defendants commit the same act as well as when defendants commit technically differing acts which result in a single injury." *Sterling*, 822 S.W.2d at 7. We review the trial court's judgment with respect to a claim of improper double recovery for an abuse of discretion. *Saden v. Smith*, 415 S.W.3d 450, 465 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

As we previously noted, the jury's award of $36,000 to MPD for breach of fiduciary duty was for MPD's actual damages. However, the damage question did not list any elements for the jury to consider. The absence of specific damage elements in the jury question frustrates our task of determining the injury that the jury determined was compensable as actual damages. Furthermore, unlike actual damages, unjust enrichment is a form of restitution that focuses on disgorging benefits that it would be unjust for the defendant to retain, rather than compensating the plaintiff for damage suffered as is the case with actual damages. *See City of Harker Heights, Tex.*, 830 S.W.2d at 317. Because of the different goals of actual damages and unjust enrichment, as well as the absence of specific damage elements

in the actual damages question, the trial court did not abuse its discretion by denying Julie's request for an election of remedies. We overrule Julie's ninth issue.

*New Trial*

As noted previously, Julie's tenth issue is a catch-all issue wherein she asserts various grounds for a new trial, including allegations of charge error and claims of factually insufficient evidence. Because we have addressed each of these complaints in the treatment of the related issues, we overrule Julie's tenth issue.

*This Court's Ruling*

We reverse the trial court's judgment to the extent that it imposed a constructive trust on Julie McLeod as the executor of Barry McLeod's estate, and we render judgment that Wanda take nothing on her request to impose a constructive trust as a remedy. In all other respects, we affirm the trial court's judgment.

JOHN M. BAILEY
CHIEF JUSTICE

April 28, 2022

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.